UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
NATHAN RUELL,                             )
                                          )
            Petitioner,                   )
                                          )        Civil Action No.
      v.                                  )        12-10042-FDS
                                          )
MCI NORFOLK SUPERINTENDENT,               )
                                          )
            Respondent.                   )
_____ )

MEMORANDUM AND ORDER ON
PETITIONER'S PETITION FOR A WRIT OF HABEAS CORPUS

SAYLOR, J.

       This is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 by a person in

state custody.  Petitioner Nathan Ruell was convicted of first-degree murder, arson of a dwelling

house, and armed burglary in Massachusetts Superior Court on February 5, 2009.[1]  On direct

appellate review, the Supreme Judicial Court affirmed the convictions.  Ruell is currently serving

a term of life imprisonment without the possibility of parole at the Massachusetts Correctional

Institution Norfolk.

       In his petition, Ruell contends that the trial court's refusal to admit evidence implicating

a third party as the perpetrator of the crimes violated his right to present a complete defense

under the Sixth and Fourteenth Amendments to the United States Constitution.  For the reasons

set forth below, the petition for a writ of habeas corpus will be denied.

I.     **Background**

       The facts surrounding the crime that led to Ruell's conviction are set out in the decision

_____

       [1] He was also convicted of unarmed burglary and larceny under $250 for a separate incident.

of the SJC; only the facts that are relevant to this opinion bear repetition.  *See Commonwealth v.*

*Ruell*, 459 Mass. 126 (2011).

### A.     The Martowski Murder

On October 10, 2005, the deceased, badly beaten body of 83-year-old Rose Ann

Martowski was discovered on the sofa of her home in Ware, Massachusetts.  The perpetrator had

ransacked the house, stealing the victim's jewelry and cash.  The victim's bedroom had been set

on fire, although the fire eventually extinguished itself.  Police discovered papers and emptied

perfume bottles on the bed, apparently used as an accelerant to the bedroom fire.

The previous night, around 5:00 p.m., the victim's next-door neighbor, 94-year-old

Sophie Cloutier, had seen a man staring into the rear of the victim's house.[2]  Later that night, she

saw a faint light in the victim's home, which she found unusual because of the victim's regular

habits.

After the body was discovered, police secured the crime scene and began an

investigation.  Police observed that the kitchen window above the sink in the victim's home was

open, there was a footprint impression at the base of the window, and there was an unsmoked

Camel "wide filter" cigarette lodged between the screen and the window.

Ruell smoked wide-filter Camel cigarettes.  The cigarette found at the scene was sent for

DNA testing, which revealed a partial DNA profile.  The profile matched Ruell's DNA.  The

probability of another randomly selected individual other than Ruell matching the DNA profile

was one in 6.24 billion as to the white population, one in 2.74 billion as to the African-American

---

[2] At trial, the court conducted an identification procedure where Ruell was seated with spectators at the rear of the courtroom and Ms. Cloutier was asked to identify the person she saw that night from the witness stand.  Ms. Cloutier identified Ruell, but noted, "I don't know if it's true or not . . . I didn't see him very close."  *Ruell*, 459 Mass. at 128 n.2.

population, and one in 2.49 billion as to the Hispanic population.

The victim did not use a checking account and paid her bills with the money she kept in her handbag.  Her handbag, three weeks earlier, had contained approximately $3,000 in cash, mostly in $100 and $50 bills.  The perpetrator took the handbag containing the victim's money, as well as a jewelry box.

Ruell was unemployed at the time of the murder.  He was a frequent user of marijuana, cocaine, and other drugs.  Shortly after the murder, he purchased cocaine and marijuana in much larger quantities and of a higher quality than normal.  One day after the victim's body was recovered, Ruell used a $100 bill to purchase video games.  Two weeks after the murder, Ruell gave a friend a piece of jewelry, and showed her a green jewelry box that she described as a style typically belonging to an older woman.  He also told her that he had won a $3,000 lottery scratch ticket.

While being held in the house of corrections awaiting trial, Ruell admitted to a fellow detainee that the had broken into a home in Ware and beaten an "old lady" to death.  He bragged about his experience and skill at breaking into homes, and that he wore a hat and gloves to avoid leaving any evidence behind.  He also revealed that after stealing money, coins, and jewelry, he "whacked" the victim and then set fire to papers and perfume bottles to cover his tracks.  He said that his only mistake was leaving a single cigarette that he used to prop open the window screen.[3]

B.     The Gurka Burglary

Between September 7 and September 11, 2005, Ruell performed part-time work for Frank Gurka, a local antiques collector who lived in Ware.  He hired Ruell to assist him in loading and

---

[3] Ruell made additional revelations to another inmate in which he admitted to killing the victim, but the details of the statement did not match the forensic evidence.

unloading antiques and collectibles that he sold at the Brimfield Fair.  On September 17, 2005,

Gurka returned home with his wife at approximately 11:00 p.m. from another antiques fair and

went to bed.  Gurka awoke the next morning to find that the screen in his bathroom window had

been removed, and that approximately $150 in cash and a collectible bottle commemorating the

flight of Apollo 15 were missing.  On July 21, 2006, Ruell gave the missing Apollo 15 bottle to a

friend, Joseph Brown, as a birthday gift.

> ### C.      The Alleged Third-Party Perpetrators

In his appeal to the SJC, and in the motion before this Court, Ruell contends that four

other individuals were the likely perpetrators of the charged crimes, either acting alone or

together.  He contends that there was sufficient evidence to raise a third-party-culprit defense

implicating Joseph Brown, Richard Chartier, Gregory Babb, or Kenneth Kowalski, and that he

was improperly precluded from doing so.

> ### 1.      Joseph Brown

Joseph Brown was a friend of Ruell's.  On at least one occasion, Brown made plans to

join Ruell in burglarizing a home.  At trial, a Ware police officer testified that on September 7,

2006, he recovered the stolen Apollo 15 bottle from Brown's residence.[4]  Brown's then-girlfriend

testified that Ruell gave Brown the bottle as a birthday present.  On cross-examination, defense

counsel attempted to elicit testimony that Brown was, at one point, a suspect in the Gurka

burglary.  The court sustained the Commonwealth's objection.[5]  The jurors did learn, however,

---

[4]  Brown was charged with possession of stolen property.

[5]  It is unclear whether defense counsel preserved a third-party-culprit challenge as to Brown.  The exchange between defense counsel and the trial court was as follows:

MR. BLACK:      . . . [T]his is my offer of proof.

that police took a swab of Brown's DNA and that he was excluded as a source of the DNA found on the cigarette left in the window sill.

### 2. Richard Chartier

Richard Chartier was initially a suspect in the murder. Chartier was a smoker who preferred Camel wide-filter cigarettes, the same kind discovered in the victim's window sill. Police were aware that around the time of the murder, Chartier was undergoing marital problems because of his gambling debts. Chartier owned a small hatchet and cutting instrument that he used to complete odd jobs. The United States Army also had an outstanding warrant lodged against him.[6]

On the basis of that information, police traveled to Alliance, Georgia, to interview Chartier. Before police made him aware of the reason for the interview, Chartier brought up the murder. Although the court allowed the jury to hear that Chartier was questioned by police, the court excluded evidence of the police's rationale for considering him a suspect. The jury also heard that police obtained a DNA swab from Chartier and that he was excluded as the source of the DNA found on the cigarette in the victim's home. After hearing the offer of proof, the court excluded third-party culprit evidence as to Chartier.

### 3. Gregory Babb

---

| | |
|---|---|
| THE COURT: | Let's start with the next-door neighbor. |
| MR. BLACK: | No, I'm not there yet. |
| THE COURT: | Mr. Brown sounds like your best one. |
| . . . | |
| THE COURT: | How many third-party culprits? |
| MR. BLACK: | Well, I was going to ask about Chartier and then I was going to ask about Gregory Babb, the next door neighbor. And I might even ask about Joe Brown, but I'm not sure. |

(Trial Tr., Vol. 12 at 153).

[6] The nature of the warrant is unclear from the trial transcript and the appellate opinion.

The jury heard evidence that Gregory Babb was the victim's next-door neighbor; that he smoked; that a DNA sample was taken from him, and that he was excluded as the source of the DNA on the cigarette; that shoes taken from his house did not match the impressions left at the victim's house; that his fingerprints did not match the fingerprints at the crime scene; that police tested his clothing and a hatchet recovered from his house for DNA evidence linking him to the crime; and that both the clothing and hatchet tested negative for blood.

Ruell contended that Babb had the opportunity to commit the crime based on his proximity to the crime scene, and the facts that he smoked, had access to a hatchet, and was awake the night of the killing. Ruell sought to call the victim's daughter to testify that the police considered Babb a suspect, that her mother had been nervous about Babb, and that she had heard Babb had a criminal record and had been in jail. The trial court disagreed and excluded further third-party culprit evidence as to Babb.

### 4. **Kenneth Kowalski**

Kenneth Kowalski was, at one point, a suspect in the murder. Defense counsel made an offer of proof that at the time of the murder Kowalski's girlfriend had an expensive drug addiction. Police questioned Kowalski about his involvement in the crime, on the apparent theory that Kowalski was motivated to rob the victim in an attempt to support his girlfriend's drug habit. The court permitted Ruell to introduce evidence that police took a swab of DNA from Kowalski, which did not match the profile found on the cigarette. The court excluded further third-party culprit evidence as to Kowalski.

### D. **The Direct Appeal**

Ruell appealed his conviction to the SJC on three grounds. First, Ruell contended that the

trial court's exclusion of third-party culprit evidence as to Brown, Chartier, Babb, and Kowalski

violated his constitutional right to present a complete defense as articulated in *Holmes v. South

Carolina*.  547 U.S. 319 (2006).  Second, Ruell challenged the constitutionality of the

Massachusetts standard for the admissibility of third-party culprit evidence, as established by

*Commonwealth v. Phinney*, 446 Mass. 155 (2005).  Under that standard, evidence implicating a

third-party is admissible if it "is of substantial probative value" and "will not tend to confuse the

jury by diverting their attention to collateral matters."  *Id.* at 163.  Third, Ruell contended that the

inclusion of the word "substantial" held defendants to a higher standard than constitutionally

permissible under *Holmes*.  This inequity, he argued, gave prosecutors the benefit of a lower bar

to introduce evidence against a defendant than the bar facing a defendant who seeks to introduce

evidence implicating third parties.

　　　　As a threshold matter, the SJC found that the formulation of the Massachusetts standard

was consistent with the accepted formulations of the third-party culprit evidence rule under

*Holmes*, 547 U.S. at 327.  *See Ruell*, 459 Mass. at 132 ("[Both standards] consider whether the

third-party culprit evidence tends to prove that someone other than the defendant committed the

crime, or whether the evidence is speculative, remote or lacks any connection to the crime

charged.").  The SJC further held that the Massachusetts rule did not create a "double standard" to

the unfair benefit of the prosecution.  *Id.*  Finally, as a matter of state law, the SJC found that the

trial court correctly excluded the third-party culprit evidence implicating each of the four named

individuals because the evidence was too remote.  *See id.* at 133-35.

　　　　After the SJC affirmed the convictions, Ruell filed a petition for a writ of certiorari in the

United States Supreme Court.  That petition was denied on October 3, 2011.

E.      **Federal Proceedings**

On January 4, 2012, Ruell filed a petition for a writ of habeas corpus pursuant to 28

U.S.C. § 2254.  In his memorandum of law, Ruell sets out virtually identical arguments to those

that the SJC rejected.  He contends that the Massachusetts standard for the admissibility of third-

party culprit evidence violated his constitutional right to present a defense under the Sixth and

Fourteenth Amendments, because the standard requires defendants to prove more than what is

permissible as set forth in *Holmes*.  He further contends that this constitutional violation had a

substantial and injurious effect on his case, as required for habeas relief by *Brecht v. Abrahamson*,

507 U.S. 619 (1993).

II.     **Analysis**

A.      **Standard of Review**

A federal court may not grant an application for a writ of habeas corpus for a person in

state custody unless the state court decision is "contrary to, or involved an unreasonable

application of, clearly established federal law, as determined by the Supreme Court of the United

States," or the decision was an "unreasonable determination of the facts in light of the evidence

presented in the State court proceeding."  28 U.S.C. § 2254(d).  Factual determinations made by

the state court are presumed correct and a petitioner bears the burden of rebutting the presumption

by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  The presumption of correctness

applies to both state trial and appellate court factual determinations.  *See Sumner v. Mata*, 449

U.S. 539, 545-47 (1981).

"'[A]n unreasonable application' of Supreme Court case law occurs if 'the state court

identifies the correct governing legal principle for th[e] [Supreme] Court's decisions but

unreasonably applies that principle to the facts of the prisoner's case." *Jackson v. Coalter*, 337 F.3d 74, 81 (1st Cir. 2003). The "unreasonable application" determination must be decided primarily on the basis of Supreme Court holdings that were clearly established at the time of the court proceedings. *See Rashad v. Walsh*, 300 F.3d 27, 35 (1st Cir. 2002). However, a court may look to factually similar cases from the lower federal courts to inform determinations and serve as a valuable reference point for applying federal law when the Supreme Court holding is broad. *See id.*

An unreasonable state court decision is not the equivalent of an incorrect decision. *See Williams v. Taylor*, 529 U.S. 362, 389 (2002); *McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir. 2002). A state court decision is objectively unreasonable only "if it is so offensive to existing precedent, so devoid of record support, or so arbitrary as to indicate that it is outside the universe of plausible, credible outcomes." *Kibbe v. DuBois*, 269 F.3d 26, 36 (1st Cir. 2001). Put another way, "some increment of incorrectness beyond error is required." *McCambridge*, 303 F.3d at 36.

Petitioner argues that the SJC's upholding of the Massachusetts standard for the admissibility of third-party culprit evidence was contrary to, or an objectively unreasonable application of, *Holmes*. For the reasons set forth below, this Court finds that the decision of the SJC was not contrary to *Holmes*, nor was it an objectively unreasonable application of *Holmes* to the facts of this case.

### B.      The *Holmes* Standard

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clause of the Sixth Amendment, the Constitution guarantees criminal defendants a 'meaningful opportunity to present a complete defense."

*Holmes*, 547 U.S. at 324 (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)).  This right is

violated by rules of evidence that "infringe upon a weighty interest of the accused" and are

"arbitrary" or "disproportionate to the purposes that they are designed to serve."  *Id.* at 325 (citing

*Crane*, 476 U.S. at 90).  However, well-established rules that give discretion to trial judges to

"exclude evidence if its probative value is outweighed by certain other factors such as unfair

prejudice, confusion of the issues, or potential to mislead the jury" clearly serve a legitimate

purpose.  *See id.* at 326.  With this in mind, the Supreme Court has long held that "the

Constitution permits judges to exclude evidence that is repetitive, only marginally relevant, or

poses an undue risk of harassment, prejudice, or confusion of the issues."  *Id.* at 326-27 (citing

*Crane*, 426 U.S. at 689-90).

A defendant is entitled to introduce evidence that shows another person committed the

crime charged in a way that raises a reasonable doubt about the defendant's guilt.  However,

*Holmes* made clear that "frequently matters offered into evidence [to prove third-party

culpability] are so remote and lack such connection with the crime that they are excluded."  547

U.S. at 327.  Thus, the court in *Holmes* drew a distinction between evidentiary rules that permit

the exclusion of evidence that is "speculative or remote, or does not tend to prove or disprove a

material fact in issue in the defendant's trial," and evidentiary rules that function arbitrarily or

disproportionately to the goal they seek to serve.  *Id.*  In drawing that distinction, the Court struck

down a South Carolina rule of evidence that treated a defendant's proffered third-party culprit

evidence as presumptively unreasonable when there was strong forensic evidence of the

defendant's guilt. *Id.* at 323-24.[7] Because the South Carolina rule only looked to the relative strength of the prosecution's evidence, rather than the probative value of the third-party culprit evidence in relation to all of the other facts, the rule was arbitrary. *Id.* at 330-31.

## C.      The Massachusetts Standard

Under Massachusetts law, a defendant is entitled to present evidence that another person committed the crime in certain circumstances. *Phinney*, 446 Mass. at 163 (citing *Commonwealth v. Rosa*, 422 Mass. 18, 22 (1996)). The evidence "must be relevant, not too remote or speculative, and must not confuse the jury by diverting their attention to collateral matters." *Id.* If such evidence "is of substantial probative value, and will not tend to prejudice or confuse, all doubt should be resolved in favor of admissibility." *Id.* (quoting *Commonwealth v. Keizer*, 377 Mass. 264 (1979).

## D.      The Massachusetts Standard Conforms with *Holmes*

The Commonwealth's standard for the admissibility of third-party culprit evidence is consistent with the holding of *Holmes* because the Massachusetts law is neither arbitrary or disproportionate to the purposes it is designed to serve. *See Holmes*, 547 U.S. at 324. Unlike the rule overturned in *Holmes*, the Commonwealth's evidentiary standard retains judicial discretion and requires a weighing of the probative value and potential prejudice of the third-party culprit evidence in light of the underlying facts of the case. The standard creates no presumptions or other arbitrary considerations. As the SJC correctly noted, both the state and federal standards

---

[7] In *Holmes*, petitioner was convicted of murder, first-degree criminal sexual assault, first-degree burglary, and robbery. He was sentenced to death. A state post-conviction review granted petitioner a new trial. At the second trial, the state relied on fingerprint, fiber, blood, and DNA evidence. Petitioner argued that he was framed, and attempted to introduce testimony from several witnesses that placed a third-party culprit at the scene of the crime right before the assault, as well as four other witnesses who testified that the third party had either admitted to committing the crimes or acknowledged that petitioner was innocent.

consider whether the proffered evidence tends to prove the guilt of a third party, or whether the evidence is too speculative, remote, or lacking in connection to the crime charged to be of value to the jury.  *See Ruell*, 459 Mass. at 132.

Petitioner takes particular issue with the phrase "substantial probative value" in the Massachusetts standard, arguing that it is either arbitrary or disproportionate to the purpose it is designed to serve.   The inclusion of the word "substantial" does not, however, make the Massachusetts standard disproportionate.  Read in context with the rest of the standard, it merely articulates the discretionary balancing that a trial judge must perform.  Likewise, petitioner's contention that the Massachusetts standard is fundamentally unfair to defendants because it sets a heightened bar for the introduction of third-party culprit evidence is also incorrect.  A fair reading of *Phinney* reveals that, if anything, Massachusetts courts are required to err on the side of admissibility with regards to evidence of third-party guilt.  446 Mass. at 163 ("[A]ll doubt should be resolved in favor of admissibility.").  Further, this has had the expected results in practice, with Massachusetts courts regularly admitting third-party culprit evidence.  *See, e.g.*, *Phinney*, 446 Mass. at 163-66; *Commonwealth v. Rosario*, 444 Mass. 540, 556-559 (2005), *Commonwealth v. Conkey*, 443 Mass. 60 (2004); *Keizer*, 377 Mass. at 268.  Accordingly, the SJC reasonably interpreted the rule of *Holmes* in deciding petitioner's appeal.

### E.        The SJC Reasonably Applied *Holmes*

The SJC applied the federal constitutional precedent to the facts of the case in conformity with the approach articulated in *Holmes*.  As the SJC noted in *Ruell*, "the judge carefully evaluated the probative value of the proffered third-party culprit evidence and the risk of unfair prejudice to the Commonwealth from the admission of such speculative and remote

12

evidence . . . ." 459 Mass. at 135.  The SJC's application of *Holmes* to the facts of this matter was objectively reasonable.  This Court will review the SJC's holding as to evidence implicating each alleged third-party culprit in turn.

### 1. Joseph Brown

Petitioner contends he should have been able to elicit testimony that Brown was a suspect at one time in the Gurka burglary.  As the SJC noted, "[t]he fact that a third party was a suspect in the police investigation is not evidence that the third party committed the crime, just as the prosecutor's decision to seek an indictment against the defendant is not evidence that the defendant committed the crime." *Ruell*, 459 Mass. at 133.

In light of *Holmes* and *Chambers v. Mississippi*, 410 U.S. 284 (1973), the SJC reasonably applied the federal constitutional standard.  In *Holmes*, the third party had admitted his guilt and declared the defendant innocent at least four times; multiple witnesses also placed him at the scene of the crime around the time it occurred.  547 U.S. at 323.  The South Carolina court nonetheless excluded this evidence of third-party culpability as unreasonable because the prosecution's forensic evidence against defendant was "strong." *Id.* at 324.  In *Chambers*, Mississippi law did not allow the defendant, charged with murder, to treat a witness as adverse when that witness had confessed to committing the murder three separate times, but then later recanted his confession.  410 U.S. at 291.  In both *Holmes* and *Chambers*, the evidence against the third party was very strong and highly relevant, and the grounds on which the courts denied admission were deemed arbitrary.  Here, the evidence against Brown was very weak and the trial court was well within its discretion to exclude the essentially irrelevant evidence that Brown had been questioned by the police.

Accordingly, the SJC did not unreasonably apply the rule of *Holmes* to the trial court's decision to exclude the evidence allegedly implicating Brown.

### 2.    Richard Chartier

As noted, the jury learned that Chartier provided a DNA sample to investigators; that DNA testing excluded him as a suspect; and that he was interviewed by the police.  Petitioner contends that his right to present a defense was violated when the trial court excluded evidence that (1) the police traveled to Georgia to interview him, (2) he correctly presumed police were there to discuss the Martowski murder, (3) he regularly carried a small hatchet, (4) he had gambling debts, (5) he had a warrant lodged against him by the United States Army, and (6) he preferred to smoke Camel wide-filter cigarettes.  The SJC found that the evidence, even when considered collectively, was too remote or speculative to be admitted.  Among other things, it noted that the mere fact of police questioning is not evidence of a crime, and that knowledge of a highly publicized, unsolved murder in a small town does not suggest consciousness of guilt. *Ruell*, 459 Mass. at 134

In short, the SJC's decision to exclude the evidence was entirely reasonable, and the court did not unreasonably apply the rule of *Holmes* to the trial court's decision to exclude the evidence allegedly implicating Chartier.

### 3.    Gregory Babb

As noted, the jury heard a variety of evidence concerning Babb.  Petitioner contends that in addition he should have been allowed to ask the victim's daughter additional questions, such as whether Babb was a suspect in the investigation.  But the proffered testimony would have only clouded the jury's understanding of the case with prejudicial speculation.  Unlike in *Holmes*,

where the state court completely precluded the third-party culprit evidence, here the court allowed

petitioner to introduce some evidence against Babb, but properly used its discretion to preclude

evidence that was speculative or irrelevant.  Under the circumstances, the SJC did not

unreasonably apply the rule of *Holmes* to the trial court's decision to exclude the evidence

allegedly implicating Babb.

### 4.    <u>Kenneth Kowalski</u>

As noted, the jury heard evidence that Kowalski provided police a DNA sample and that

testing excluded him as a match from the recovered cigarette.  Petitioner sought to introduce

evidence that Kowalski's girlfriend had an expensive drug addiction and that police, at one point,

considered Kowalski a suspect.  The SJC upheld the trial court's decision on the grounds that the

evidence was not probative of guilt.  Under the circumstances, the SJC did not unreasonably

apply the rule of *Holmes* to the trial court's decision to exclude the evidence implicating

Kowalski.

In sum, the Commonwealth's standard for the admissibility of third-party culprit evidence

is consistent and not contrary to the holding of *Holmes v. South Carolina*.  The trial judge and the

SJC reasonably applied settled Supreme Court precedent to the facts in this matter.  Both courts

analyzed the facts of this case and determined that the potential third-party evidence lacked a

connection to the crimes charged and was not sufficiently probative of establishing petitioner's

lack of guilt.  Accordingly, the petition for a writ of habeas corpus will be denied.

### F.    *<u>Brecht</u>* <u>Standard</u>

Petitioner further contends that the Massachusetts third-party culprit standard not only

fails to satisfy *Holmes*, but that its application in this matter had "substantial and injurious effect

or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 631.  Because there has not

been a constitutional error, this Court need not discuss the issue.

**III.**    <u>**Conclusion**</u>

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

**So Ordered.**


<u>/s/ F. Dennis Saylor</u>
F. Dennis Saylor IV
Dated:  March 19, 2013                                     United States District Judge